# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

K & S ASSOCIATES, INC.,       )
                                     )
        Plaintiff,          )
                                     )
v.                           )      No. 3:09-01108
                                     )      JUDGE HAYNES
                                     )
AMERICAN ASSOCIATION OF   )
PHYSICISTS IN MEDICINE       )
                                     )
        Defendant.        )

## M E M O R A N D U M

Plaintiff, K & S Associates, Inc., filed this action under 15 U.S.C. §§ 1 and 26, federal antitrust statutes, against the Defendant, American Association of Physicists in Medicine ("AAPM"). Plaintiff asserts claims for conspiracy in restraint of trade in violation of Section 1 of the Sherman Act arising from the Defendant's denial of its reaccreditation of Plaintiff to provide services related to radiation therapy based upon anticompetitive concerns of its members that include Plaintiff's competitors.

Before the Court is the Defendant's motion to dismiss (Docket Entry No. 26), contending, in sum, that Plaintiff's amended complaint fails to allege sufficient facts that Defendant and the alleged co-conspirators entered into an illegal agreement to restrain Plaintiff's trade and that Plaintiff's factual allegations of mere parallel business conduct do not state a claim under Section 1 of the Sherman Act. In its response (Docket Entry No. 28), Plaintiff asserts, in essence, that its amended complaint contains sufficient factual allegations to state a plausible claim for relief for the Defendant's conspiracy with Plaintiff's competitors to put Plaintiff out of business.

1

For the reasons set forth below, the Court concludes that Defendant's motion to dismiss should be denied as Plaintiff's amended complaint contains sufficient factual allegations to state a plausible claim that Defendant's alleged acts constitute a conspiratory and concerted refusal to deal in violation of Section of 1 of the Sherman Act.

## A. ANALYSIS OF AMENDED COMPLAINT

Plaintiff is one of three Accredited Dosimetry Calibration Laboratories ("ADCLs") in the United States. (Docket Entry No. 23, Amended Complaint at ¶ 7). ADCLs calibrate a line of commercial products broadly classified as "dosimetry" equipment that assesses the extent that biological tissue has absorbed radiation during radiation therapy. Id. The other two ADCLs in the United States are the University of Wisconsin ADCL ("UW ADCL") and the M.D. Anderson Cancer Center ADCL ("Anderson ADCL") that is affiliated with the University of Texas at Houston. Id. at ¶ 13. Dr. Larry DeWerd is UW ADCL's director. Id. at ¶ 14. DeWerd also holds an ownership interest in Standard Imaging, Inc. ("SII"), a Wisconsin corporation that manufactures dosimetry equipment. Id. Dr. Geoffrey Ibbott is the Anderson ADCL's director. Id. at ¶ 15.

Defendant AAPM is a trade association that accredits ADCLs. Id. at ¶ 8. The end users of dosimetry equipment in the medical community will not utilize the calibration services of any private laboratory unless that laboratory is accredited by the AAPM. Id. According to Plaintiff, there are not any ADCLs that currently operate in the United States without AAPM accreditation and that an ADCL could not operate or maintain customers in the United States without AAPM accreditation. Id. Plaintiff has been an AAPM-accredited ADCL since 1982. Id.

Under AAPM's procedures, an ADCL must apply for re-accreditation to the Calibration Laboratory Accreditation Subcommittee ("CLAS"), a subcommittee of the AAPM's Therapy Physics Committee ("TPC"). This re-application must occur every four years or upon the occurrence of one or more "triggering events," such as a change in ownership of an ADCL. Id. at ¶¶ 9-10. CLAS's voting members submit a recommendation directly to AAPM's board of directors for final action. Id. at ¶ 9. According to Plaintiff, if the CLAS makes a negative recommendation, the affected ADCL may appeal to the TPC prior to the final Board action. Id.

In addition to the re-accreditation process, the CLAS co-chairs conduct annual "surveillance visits" to each ADCL to evaluate its continuing compliance with AAPM accreditation criteria. A negative report or unsatisfactory surveillance visit can trigger AAPM's re-examination of the ADCL's accreditation status. Id. During Plaintiff's twenty-seven years as an AAPM-accredited ADCL, Plaintiff has not had a negative report or unsatisfactory surveillance visit. Id. at ¶ 12.

Late in 2008, Plaintiff entered into an agreement with Physikalisch-Technische Werkstaetten Dr. Pychlau GmbH ("PTW"), a German manufacturer of dosimetry equipment, to sell Plaintiff's stock. Id. at ¶ 16. PTW is a SII competitor. Id. Because PTW-Freiburg's acquisition of Plaintiff would automatically trigger the re-accreditation process by AAPM, an essential condition for the sale was AAPM's continued accreditation of Plaintiff. Id. As a result, on August 29, 2008, Tom Slowey, Plaintiff's president, contacted Dr. Jan Seuntjens and Dr. Malcolm McEwen, the CLAS's co-chairs, for "recommendations" of any needed changes in Plaintiff's policies and procedures to ensure compliance with AAPM's conflict of interest rules and to effect the stock purchase. Id. at ¶ 17.

3

On September 4, 2008, Dr. Seuntjens identified four concerns, including potential conflicts of interest with this agreement.  Id. at ¶ 18.  This September 4th letter stated, in pertinent part:

> Our main concern are the impartiality of the calibrations and the disconnect from manufacturers' market interests:
>
> 1. Without wishing you to reveal sensitive information we would appreciate a little more detail on the tentative agreement reached with PTW. What level of ownership is to be transferred? Your letter implies a majority holding by PTW and therefore a major concern is how independent K&S will remain from its parent organization.
>
> 2. As for any major change in staffing the lab will need to provide an updated quality manual that outlines the management structure of the new K&S, including the links to the senior management of PTW. As you note in your letter, the main issue is that of conflict of interest but our concern is also for the potential staff changes that will be implemented at, or afer, the transfer of ownership.
>
> 3. We note that PTW currently sells chambers caring calibration certificates from Freiburg. The end-user in North America is then free to send chambers to any of the calibration labs in the network. With regards to PTW chambers, what will the mode of operation be for devices sold on the North American market? Will PTW automatically include a K&S calibration? There is the clearly the potential for a manufacturer to not only gain a competitive commercial advantage but adversely affect the unbiased nature of the present network.
>
> 4. Conversely, will K&S remain open for the calibration of devices manufactured by companies other than PTW? We do not expect any changes to the present operation but we feel it safer to ask at ths point.

Id. at Exhibit C.[1]

On September 9, 2008, Slowey responded to each concern explaining that PTW's offer to purchase all of Plaintiff's outstanding stock included retention of Plaintiff's current staff after the stock transaction, and that Plaintiff would continue to offer calibration services for all dosimetry instrument manufacturers.  Id. at Exhibit D.  As to item 3, Slowey stated:

---

[1]As discussed infra, exhibits to a complaint are deemed to be part of the complaint.

Item 3: PTW plans to offer its chambers and electrometers to customers in the US with NIST traceability from the K&S ADCL. While PTW may, from time to time, have promotions for instruments that include a K&S ADCL calibration, PTW will normally charge for the calibration. If PTW does provide a K&S calibration without additional charge, the customer is still free to send it to another ADCL. However, since the AAPM has for many years promoted the concept that all the ADCLs are equally competent to provide traceable calibrations, it is more likely that the customer will accept the free calibration and send it elsewhere when it is due for recalibration.

It is important that you are realistic about the status of the current network. The present network is not without bias or possible conflicts of interest. I believe that all the labs have major customers (manufacturers or sales organizations) that provide significant business to their lab. All of us are biased in their favor because it means more business for the lab. For example, I believe that it is common knowledge that the Director of the largest lab in the present network owns a significant interest in a major dosimetry manufacturer. The University where the lab is located licenses the manufacturer to make and sell its designs and receives a royalty from the manufacturer from every sale. While the ADCL is not owned by the manufacturer, the management of the ADCL is biased toward the one manufacturer and the manufacturer is biased toward the ADCL.

I believe that ths transaction will strengthen the network by,

1. requiring the development of appropriate policies and procedures pursuant to Section 4.1.5,

a. to make customers aware of the PTW ownership if advice on the purchase of instruments is given,
b. to require officers and directors to disclosure any personal holdings that might create a conflict of interest,
c. to reduce or eliminate possible conflicts of interest,
d. to eliminate any adverse influence on the objectivity of the lab and,

2. providing better local support for the PTW chambers and electrometers.

Id.

In an email dated September 10, 2008 and copied to Dr. McEwen, Dr. Seuntjens stated that Slowey's letter "adequately addresses our questions," and that the accreditation status would "stay the same and as long as the conflict of interest issue is addressed satisfactorily, continued

accreditation until the surveillance visit can be maintained." Id. at Exhibit E. On September 16, 2008, Slowey sought clarification that "the ongoing AAPM accreditation status of K&S will be maintained as long as the conflict of interest issue is satisfactorily addressed with the new ownership." Id. at Exhibit F. On September 18, 2008, Dr. Seuntjens responded, stating:

> You are right. The statement should read: "The accreditation status will stay the same and as long as the conflict of interest issue is addressed satisfactorily, continued accreditation can be maintained."
>
> I drew attention to the surveillance visit, since that would be the point at which we propose to evaluate the new managerial structure and see if it indeed is satisfactory with respect to conflict of interest. But this is a surveillance visit as any other, i.e., with the mechanisms to deal with any roadblock should there be any.
>
> So the bottom-line is that at this stage we don't see any problem until the new structure is in place and we see the surveillance visit as the point to evaluate the de facto situation.

Id. at Exhibit G.

On November 20, 2008, Plaintiff sent its proposed conflict-of-interest policies and procedures to Drs. Seuntjens and McEwen for their review and any suggested changes. Id. at ¶ 22. According to Plaintiff, the CLAS's co-chairs' only recommendation was to allow laboratory staff to give advice about instrument performance to customers, subject to certain conditions. Id. Plaintiff's original terms prohibited laboratory personnel from giving any advice about dosimetry instruments to customers. Id. On January 16, 2009, PTW acquired Plaintiff's stock, effective Jan. 1, 2009. Id. at ¶ 23.

In April 2009, Drs. Seuntjens and McEwen, the CLAS co-chairs, conducted a "surveillance visit" to Plaintiff, primarily to assess the implementation of the conflict-of-interest policies and procedures. Id. at ¶ 24. Thereafter, on May 5, 2009, Dr. Seuntjens communicated

with Dr. Christian Pychlau, PTW-Freiburg's principal and co-owner, to express serious concerns about an advertisement by PTW's United States subsidiary, PTW-New York, that advertised K&S calibration in conjunction with PTW-Freiburg dosimetry equipment. Id. at ¶ 25. Dr. Seuntjens wrote:

> We are very concerned about this as it appears to be contrary to all that was said during the recent surveillance visit to K&S. It would seem that although K&S have developed conflict-of-interest procedures to separate operation of the calibration laboratory from its parent company, PTW-NY have no problems with integrating the ADCL in its marketing activities. At best this flyer indicates a very poor understanding of the ADCL network and the need for calibration laboratories to operate, and appear to operate, as independent entities. At worst, it would suggest that the intentions expressed during the site visit were nothing more than what was necessary to ensure continued accreditation.

> The Calibration Laboratory Accreditation Sub-committee of the AAPM has a role not only to accredit ADCLs but also to maintain an unbiased technical resource for AAPM members. Such close linking of K&S calibrations with the sales of PTW chambers may conform with the lab's quality manual and with the wording of AAPM Criteria but it strongly gives the impression that the lab will have a bias towards one manufacturer.

> We believe that the reputation of the K&S ADCL will be affected by these types of marketing exercises and would therefore ask that activities that explicitly link PTW sales business with K&S accredited calibrations be strongly discouraged.

Id. at Exhibit K.

Dr. Pychlau did not view the PTW-New York advertisement as violating AAPM rules or criteria, but apologized and offered to discontinue the brochure. Id. at ¶ 26. Dr. Seuntjens did not respond. Id. In a subsequent letter, Dr. Pychlau reviewed SII's website and noted that SII's website included statements that evinced bias favoring UW ADCL, and asked "what exactly we should do differently to avoid any conflict with AAPM interests." Id. at Exhibit K at 8-9. Dr. Pychlau noted that UW ADCL's website lacked a "very comprehensive list of manufacturers":

I am not quite convinced that the choice of dosimetry manufacturers listed can be considered impartial. (A similar list of links does not exist on the K&S website. Here only the two companies are listed to which K&S has links of friendship and the PTW connection of course is clearly stated on the front page to avoid any doubt.)

So while of course always very much trying to conform with the AAPM criteria I still would ask that our new cooperation between K&S and PTW should not be treated differently from existing cooperations.

Id. at Exhibit K at 6.

As to Dr. Seuntjens' concern over PTW's advertising, Slowey reviewed AAPM's website and discovered Dr. Seuntjens's April 7, 2009 CLAS report to the TPC. Id. at ¶ 27. This April 7th report discussed PTW's acquisition of K&S and noted that CLA management had received "letters of protest" from the UW ADCL "board" and an unnamed "competing ion chamber manufacturer." Id. Plaintiff alleges that the cited "competing ion chamber manufacturer" is SII and that these "competitors of K&S and PTW-Freiburg sought to use the CLA to harm K&S's competitive position in the marketplace." Id.

In a series of communications, Dr. Pychlau provided Dr. Seuntjens proof of SII advertisement with the UW ADCL, id. at ¶ 28, as well as the allegedly widely-known synergy between the UW ADCL and SII, that is facilitated by Dr. DeWerd's position with both entities. Id. Plaintiff alleges that a sampling of SII's advertisements reveal the following:

a. The UW ADCL receives substantial business from Standard Imaging sales of instruments and Standard Imaging's promotion of the UW ADCL's services (in a manner materially indistinguishable from the flyer that drew objection from K&S's competitors). For example, included in Exhibit M is a Standard Imaging promotional "flyer" that offers its customers the opportunity to have their dosimetry equipment hand-carried to the UW ADCL for "FREE" testing.

b. Dr. DeWerd is both the director of the UW ADCL and also a part owner of Standard Imaging.

8

c. To the best of K&S's knowledge, the CLA has to this point simply accepted Dr. DeWerd's bald assertion (in his AAPM "Member Profile") that he has no conflict of interest based on these facts, and has not even suggested that conflict of interest procedures be implemented at the UW ADCL.

Id.

In its June 12, 2009 surveillance report, the CLAS co-chairs assessed the conflict of interest issue and concluded that AAPM's requirements concerning conflicts of interest "are being met," and that the "issue of conflict of interest will need to be reviewed on a regular basis to insure continued compliance." Id. at ¶ 24. In their report, the CLAS co-chairs recommended re-accreditation of K & S "under the new ownership of PTW," with the final report to be presented to CLAS review and vote at its July 2009 meeting. Id.

On July 25, 2009, a "conflict of interest roundtable" was allegedly convened, in conjunction with a scheduled AAPM meeting, "to discuss the current handling of conflict of interest (COI) procedures in the AAPM CLA Criteria." Id. at ¶ 29, Exhibit N. Each ADCL was to provide a copy of its COI protocol and any associated documentation. Id. At this roundtable meeting were Angela Keyser, AAPM Executive Director, Jerry White, AAPM's Chairman of the Board, Steve Seltzer, a representative from the NIST, Seuntjens, McEwen, Ibbott, DeWerd, and Slowey. Id. Plaintiff alleges the following:

Although Dr. Seuntjens's email stated, in essence, that a general discussion of conflict of interest procedures was to occur at this meeting and requested each ADCL to provide a copy of its COI protocol and any associated documentation to that end, **when the roundtable convened, the sole topic of discussion consisted of whether PTW-Freiburg's ownership of K&S was "acceptable" to the UW ADCL and the M.D. Anderson ADCL (K&S's only two competitors). On behalf of the UW ADCL and the M.D. Anderson Cancer Center ADCL, respectively, Dr. DeWerd and Dr. Ibbott flatly stated that PTW-Freiburg's ownership was unacceptable to them, notwithstanding *any* conflict of interest procedures that might be put into place.** In other words, K&S's direct competitors were permitted to directly

influence the decision as to whether K&S should be permitted to continue to operate as an ADCL. The upshot of the meeting was that **the voting membership of the CLA was pressured to vote against reaccrediting K&S in the meeting of that body that followed shortly thereafter the same day, notwithstanding the favorable recommendation for re-accreditation that K&S had received from the CLA co-chairs who had specifically considered the conflict of interest issue.**

Id. at ¶ 30 (emphasis added). Plaintiff further alleges that:

No representative of K&S had any prior notice or knowledge that the real agenda of the roundtable discussion was the PTW/K&S relationship in particular. In that connection, neither Dr. DeWerd nor Dr. Ibbott produced a copy of his laboratory's COI procedures (as Dr. Seuntjens's email had requested), and both made negative comments about PTW's products. The actual topic of the roundtable discussion came as a complete surprise to Mr. Slowey, and the "notice" that the July 7 email had provided turned out to have been misleading as it related to K&S.

Id. at ¶ 31.

The CLA voting membership met later that day and rejected CLAS co-chair's motion to recommend the re-accreditation of K&S as an AAPM ADCL. Id. at ¶ 32. In a letter dated July 27, 2009, Dr. Seuntjens stated, in part:

As you know, one of the items discussed and voted upon was the report of the surveillance visit we performed at the K&S Associates facilities on April 21, 2009, your response to it as well as the associated considerations related to Conflict of Interest as guided by the current AAPM Criteria.

Id. at Exhibit O. The CLA informed Plaintiff that its decision was "forwarded to the AAPM Board of Directors for consideration and action." Id. Plaintiff alleges, however, that CLA did not provide "any reason or basis for the CLA's decision, was not given any evidence considered by the CLA, and was not given a copy of the minutes of the CLA's meeting." Id. at ¶ 32.

In a September 1, 2009 letter, AAPM's counsel stated that the AAPM's decision was "not final until voted on by the AAPM Board of Directors," and that "AAPM anticipates that its Board of Directors will vote on this, and other matters, when it convenes at the end of November

2009." Id. at Exhibit P. In response, on October 30, 2009, Plaintiff submitted an appeal of the CLA's decision to the TPC based upon its assumption that the CLA had pretextually rejected K&S's re-accreditation based upon conflict of interest concerns. Id. at ¶¶ 32-33. Plaintiff was informed that the TPC may send the matter to the AAPM's board of directors for final action "prior to the time that K&S was notified of the TPC's decision concerning the appeal." Id. at ¶ 33.

Plaintiff repeatedly attempted to determine "the time frame in which the appeal would be adjudicated, whether K&S would have the opportunity to appear and be heard, and whether there would be an interval between the decision of the TPC and any final action by the board." Id. at ¶ 34. Plaintiff was informed that "the Board of Directors of AAPM would consider the matter on November 28, 2009," but Defendant's counsel also "conveyed that the board might meet electronically on some other, unspecified date." Id. at ¶ 35. The AAPM allegedly refused to provide any other response to Plaintiff's requests for information or the production of any documents or other evidence that the CLA considered or that the TPC or Board of Directors might consider. Id. at ¶ 36.

On Nov. 2, 2009, Plaintiff sent a letter to Defendant's counsel raising the issue of whether AAPM was engaged in an antitrust conspiracy against K&S to which AAPM did not respond. Id. at ¶ 37. Plaintiff construes Defendant's silence as an admission of antitrust conspiracy.[2] Plaintiff asserts that based the factual allegations in its amended complaint, if AAPM refuses to

---

[2]Plaintiff also cites Defendant's representation at the hearing on Plaintiff's application for a temporary restraining order on November 18, 2009 that Plaintiff's continued accreditation raised a "safety issue," not a conflict of interest issue. Plaintiff argues that the inference is that AAPM was not acting in good faith and AAPM intended to deny K&S's re-accreditation without good cause. The Court does not consider that allegation in resolving Defendant's motion to dismiss.

re-approve K&S's accreditation, then AAPM's refusal "will constitute a concerted refusal to deal, which is per se illegal under the Sherman Act § 1." (Docket Entry No. 23, Amended Complaint at ¶ 41). Specifically, Plaintiff alleges that "AAPM," acting through the CLA, engaged in a conspiracy with Plaintiff's competitors, UW ADCL and M.D. Anderson, Standard Imaging, and Dr. DeWerd to orchestrate a concerted refusal to deal with Plaintiff in violation of § 1 of the Sherman Act. Id. at ¶ 42.

## II. CONCLUSIONS OF LAW

Upon a motion to dismiss, "a civil complaint only survives a motion to dismiss if it 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Courie v. Alcoa Wheel & Forged Prods., 577 F.3d 625, 629 (6th Cir. 2009) (quoting Ashcroft v. Iqbal, _ U.S. _, 129 S.Ct. 1937, 1949 (2009)) (citation omitted). The Court must "'construe the complaint in the light most favorable to the plaintiff, accept all its allegations as true, and draw all reasonable inferences in favor of the plaintiff,'" In re Travel Agent Comm'n Antitrust Litig., 583 F.3d 896, 903 (6th Cir. 2009) (citation omitted), but "'need not accept as true legal conclusions or unwarranted factual inferences . . . and conclusory allegations or legal conclusions masquerading as factual allegations will not suffice.'" Id. (citations and quotation marks omitted).

In Iqbal, the Supreme Court explained the requirements for evaluating a motion to dismiss under Fed. R. Civ. P. 12(b)(6):

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.

Id., at 555 (citing <u>Papasan v. Allain</u>, 478 U.S. 265, 286, (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S., at 555. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." <u>Id.</u> at 557.

**To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." <u>Id.</u>, at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. <u>Id.</u>, at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. <u>Ibid</u>. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" <u>Id.</u>, at 557 (brackets omitted).**

Two working principles underlie our decision in <u>Twombly</u>. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. <u>Id.</u>, at 555, . . . Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. <u>Id.</u>, at 556. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. 490 F.3d, at 157-158. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not "show[n]"-"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

**In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.**

<u>Id.</u> at 1949-50 (emphasis added).

As the Sixth Circuit stated, "[a] motion under rule 12(b)(6) is directed solely to a complaint itself . . . [.]" <u>Sims v. Mercy Hosp.</u>, 451 F.2d 171, 173 (6th Cir. 1971). Yet, in evaluating a plaintiff's complaint , under Fed.R.Civ.P. 10(c), any matters attached to the

13

pleadings are considered part of the pleadings as are documents that a defendant attaches to a

motion to dismiss that are referred to in the complaint and "central" to the claim. Weiner v.

Klais and Co., Inc., 108 F.3d 86, 89 (6th Cir. 1997)

Defendant contends that Plaintiff's amended complaint lacks any factual allegations of an

illegal agreement between AAPM (through the CLA as its agent) and the alleged co-conspirators

to enter into a conspiracy. In Defendant's view, Plaintiff's amended complaint alleges only acts

of parallel conduct in furtherance of the alleged co-conspirator's economic self-interests.

Section 1 of the Sherman Act provides that:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in
> restraint of trade or commerce among the several States, or with foreign nations, is
> declared to be illegal. Every person who shall make any contract or engage in any
> combination or conspiracy hereby declared to be illegal shall be deemed guilty of a
> felony, and, on conviction thereof, shall be punished by fine not exceeding
> $100,000,000 if a corporation, or, if any other person, $1,000,000, or by
> imprisonment not exceeding 10 years, or by both said punishments, in the discretion
> of the court.

15 U.S.C.A. § 1.

To be liable under § 1 of the Sherman Act, 15 U.S.C. § 1, requires a "contract, combination

..., or conspiracy, in restraint of trade or commerce." Twombly, 550 U.S. at 548. In Twombly, the

Supreme Court stated:

> Because § 1 of the Sherman Act "does not prohibit [all] unreasonable restraints of
> trade ... but only restraints effected by a contract, combination, or conspiracy,"
> Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 775, 104 S.Ct. 2731,
> 81 L.Ed.2d 628 (1984), "[t]he crucial question" is whether the challenged
> anticompetitive conduct "stem[s] from independent decision or from an agreement,
> tacit or express," Theatre Enters. v. Paramount Film Distrib. Corp., 346 U.S. [537,
> 540, 74 S.Ct. 257, 98 L.Ed. 273 (1954) ]. While a showing of parallel "business
> behavior is admissible circumstantial evidence from which the fact finder may infer
> agreement," it falls short of "conclusively establish[ing] agreement or ... itself
> constitut[ing] a Sherman Act offense." Id. at 540-41, 74 S.Ct. 257. Even "conscious

14

parallelism," a common reaction of "firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions" is "not itself unlawful." <u>Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.</u>, 509 U.S. 209, 227, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993).

<u>Id.</u> at 553-54.

In <u>Iqbal</u>, the Supreme Court reiterated its <u>Twombly's</u> ruling that an antitrust complaint alleging parallel conduct was legally insufficient:

> [In <u>Twombly</u>], we considered the sufficiency of a complaint alleging that incumbent telecommunications providers had entered an agreement not to compete and to forestall competitive entry, in violation of the Sherman Act, 15 U.S.C. § 1. Recognizing that § 1 enjoins only anticompetitive conduct "effected by a contract, combination, or conspiracy," <u>Copperweld Corp. v. Independence Tube Corp.</u>, 467 U.S. 752, 775, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), the plaintiffs in <u>Twombly</u> flatly pleaded that the defendants "ha[d] entered into a contract, combination or conspiracy to prevent competitive entry ... and ha[d] agreed not to compete with one another." 550 U.S. at 551, 127 S.Ct. 1955 (internal quotation marks omitted). The complaint also alleged that the defendants' "parallel course of conduct ... to prevent competition" and inflate prices was indicative of the unlawful agreement alleged. <u>Ibid.</u> (internal quotation marks omitted).

> The Court held the plaintiffs' complaint deficient under Rule 8. In doing so [,] it first noted that the plaintiffs' assertion of an unlawful agreement was a " 'legal conclusion' " and, as such, was not entitled to the assumption of truth. <u>Id.</u>, at 555, 127 S.Ct. 1955. Had the Court simply credited the allegation of a conspiracy, the plaintiffs would have stated a claim for relief and been entitled to proceed perforce. The Court next addressed the "nub" of the plaintiffs' complaint-the well-pleaded, nonconclusory factual allegation of parallel behavior-to determine whether it gave rise to a "plausible suggestion of conspiracy." <u>Id.</u> at 565-566, 127 S.Ct. 1955. Acknowledging that parallel conduct was consistent with an unlawful agreement, the Court nevertheless concluded that it did not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior. <u>Id.</u> at 567. Because the well-pleaded fact of parallel conduct, accepted as true, did not plausibly suggest an unlawful agreement, the Court held the plaintiffs' complaint must be dismissed. <u>Id.</u>, at 570.

129 S.Ct. at 1950.

Plaintiff's claim is that the Defendant participated with its members in a concerted refusal to deal or boycott. Plaintiff relies upon <u>Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.</u>, 364 U.S. 656 (1961) to argue that AAPM lacks any economic self-interest as a nonprofit trade association that accredits ADCLs and that Plaintiff's competitors and AAPM members have used AAPM to exclude Plaintiff from the market by denying Plaintiff necessary AAPM certification.

In <u>Radiant Burners</u>, the plaintiff, a manufacturer of gas burners sued among others, the defendant, American Gas Association ("AGA"), that operated "testing laboratories wherein it purport[ed] to determine the safety, utility, and durability of gas burners." <u>Id.</u> at 658. The <u>Radiant Burners</u> plaintiff alleged that AGA allowed its testing process to be "influenced by respondents, some of whom are in competition with [the plaintiff], and thus its determinations can be made 'arbitrarily and capriciously.'" <u>Id.</u> The plaintiff there also alleged that it twice submitted its burner to AGA for approval, but AGA did not give its approval, although the burner was safer and more efficient than, and just as durable as, gas burners that AGA had approved. <u>Id.</u> Without the AGA's seal of approval, AGA's utility members refused to provide gas for use in the plaintiff's burners, rendering them essentially worthless. <u>Id.</u> at 658-59. The Supreme Court found the AGA's acts in context with its members to state a violation of Section 1 of the Sherman Act:

> The allegation in the complaint that 'AGA and its Utility members, including Peoples and Northern, effectuate the plan and purpose of the unlawful combination and conspiracy * * * by * * * refusing to provide gas for use in the plaintiff's Radiant Burner(s)' because they 'are not approved by AGA' clearly shows 'one type of trade restraint and public harm the Sherman Act forbids.

* * *

The conspiratorial refusal 'to provide gas for use in the plaintiff's Radiant Burner(s) (because they) are not approved by AGA' therefore falls within one of the 'classes of restraints which from their 'nature or character' (are) unduly restrictive, and hence forbidden by both the common law and the statute[.]'

Id. at 659-660.

Later, in American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp., 456 U.S. 556 (1982), the Supreme Court recognized as a viable boycott claim under Section 1 of the Sherman Act where a licensing association is used by its members to exclude a competitor.

ASME wields great power in the Nation's economy. Its codes and standards influence the policies of numerous States and cities, and, as has been said about "so-called voluntary standards" generally, its interpretations of its guidelines "may result in economic prosperity or economic failure, for a number of businesses of all sizes throughout the country," as well as entire segments of an industry. . . .When it cloaks its subcommittee officials with the authority of its reputation, *571 ASME permits those agents to affect the destinies of businesses and thus gives them the power to frustrate competition in the marketplace.

Id. at 570-71 (citations omitted).

Concerted refusals to deal or boycotts remain actionable under Section 1 of the Sherman Act. Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co., 472 U.S. 284, 289-98 (1985), particularly where, as here, private associations allegedly use "procedures that prevent the standard-setting process from being biased by members with economic interests in stifling product competition." Allied Tube & Conduct Corp. v. Indian Head, Inc., 486 U.S. 492, 500 (1988). Albeit in the context of a "single entity" defense, the Supreme Court recently cited Radiant Burners as applicable where the conspiracy involved "competitiors [that] were part of a professional organization." American Needle, Inc. v. National Football League, 130 S.Ct. 2201, 2210 n.4 (2010). The factual allegations here involve a conspiracy and Defendant mischaracterizes Plaintiff's claim as conscious parallel business conduct.

Here, Plaintiff sought "recommendations" from Seuntjens and McEwen for any needed changes in Plaintiff's policies and procedures to insure compliance with AAPM's conflict of interest rules. (Docket Entry No. 23 at ¶ 17). Slowey responded, addressing each of the four areas of concern raised by Dr. Seuntjens's September 4, 2008, letter and noted that the present ADCL network was not without bias or possible conflicts of interest: "the Director of the largest lab in the present network owns a significant interest in a major dosimetry manufacturer. The University where the laboratory is located licenses the manufacturer to make and sell its designs and receives a royalty from the manufacturer from every sale. While the ADCL is not owned by the manufacturer, the management of the ADCL is biased toward the one manufacturer and the manufacturer is biased toward the ADCL." Id. at ¶ 18; Exhibit D. Dr. Seuntjens responded that Slowey's letter "adequately addresses our questions." Id.

After Dr. Seuntjens communicated to Dr. Pychlau about concerns over the advertisement by PTW-Freiburg's U.S. subsidiary (PTW-NY), Dr. Pychlau compared SII's website, noting that the text on SII's website showed bias towards the UW ADCL, and asked Dr. Seuntjens "what exactly we should do differently to avoid any conflict with AAPM interests." Id. at Exhibit K at 8-9. In reference to UW ADCL's website, Dr. Pychlau also raised his concerns to bias, stating:

> I am not quite convinced that the choice of dosimetry manufacturers listed can be considered impartial. (A similar list of links does not exist on the K&S website. Here only the two companies are listed to which K&S has links of friendship and the PTW connection of course is clearly stated on the front page to avoid any doubt.)

> So while of course always very much trying to conform with the AAPM criteria I still would ask that our new cooperation between K&S and PTW should not be treated differently from existing cooperations.

Id. at Exhibit K at 6.

18

Slowey reviewed AAPM's website and discovered a CLA report to the TPC drafted by Dr. Seuntjens on April 7, 2009, discussing PTW-Freiburg's acquisition of K&S and noting that CLA management had received "letters of protest" from the UW ADCL "board" and an unnamed "competing ion chamber manufacturer." Id. at ¶ 27. In a series of communications, Dr. Pychlau provided proof to Dr. Seuntjens that SII advertised in conjunction with the UW ADCL. Id. at ¶ 28. Plaintiff further pointed out the widely-known synergy between the UW ADCL and SII, facilitated by Dr. DeWerd's position with both entities. Id.

Plaintiff was advised that *each* ADCL was to provide a copy of its COI protocol and any associated documentation at the July 25, 2009, "conflict of interest roundtable." Id. at ¶ 29 (emphasis added). Yet, Plaintiff specifically alleges that:

> Although Dr. Seuntjens's email stated, in essence, that a general discussion of conflict of interest procedures was to occur at this meeting and requested each ADCL to provide a copy of its COI protocol and any associated documentation to that end, when the roundtable convened, the sole topic of discussion consisted of whether PTW-Freiburg's ownership of K&S was "acceptable" to the UW ADCL and the M.D. Anderson ADCL (K&S's only two competitors). On behalf of the UW ADCL and the M.D. Anderson Cancer Center ADCL, respectively, Dr. DeWerd and Dr. Ibbott flatly stated that PTW-Freiburg's ownership was unacceptable to them, notwithstanding *any* conflict of interest procedures that might be put into place.

Id. at ¶ 30. Plaintiff further alleges that:

> No representative of K&S had any prior notice or knowledge that the real agenda of the roundtable discussion was the PTW/K&S relationship in particular. In that connection, neither Dr. DeWerd nor Dr. Ibbott produced a copy of his laboratory's COI procedures (as Dr. Seuntjens's email had requested), and both made negative comments about PTW's products. The actual topic of the roundtable discussion came as a complete surprise to Mr. Slowey, and the "notice" that the July 7 email had provided turned out to have been misleading as it related to K&S.

Id. at ¶ 31.

Despite the CLA co-chairs' June 12, 2009 surveillance report that AAPM's requirements concerning conflicts of interest "are being met," and recommendation for Plaintiff's re-accreditation, the CLA co-chairs' recommendation was rejected. Id. at ¶¶ 24, 32. Plaintiff was not given "any reason or basis for the CLA's decision, was not given any evidence considered by the CLA, and was not given a copy of the minutes of the CLA's meeting." Id. at ¶ 32. Although Defendant argues that Exhibit O "clearly states" the reason for rejection was guided by conflict of interest concerns under the AAPM's ADCL criteria, the Court differs in its reading of Exhibit O that states:

> As you know, one of the items discussed and voted upon was the report of the surveillance visit we performed at the K&S Associates facilities on April 21, 2009, your response to it **as well as** the associated considerations related to Conflict of Interest as guided by the current AAPM Criteria.

Id. at Exhibit O (emphasis added). This letter does not elaborate what "the associated considerations related to Conflict of Interest" entail nor does the letter provide any specific reasons as to why Plaintiff purportedly did not meet AAPM criteria.

Here, AAPM's accreditation is allegedly necessary to enter the ACDL market that has only three firms providing ACDL services in the United States. Plaintiff also alleges that AAPM allowed its members, including Plaintiff's competitors, to exclude Plaintiff from this highly concentrated market. Plaintiff also alleges bias and inconsistent positions of AAPM and its members on conflict of interest policies and practices. Under these factual allegations, the Court concludes that Plaintiff has stated a plausible Section 1 boycott claim.

Accordingly, the Court concludes that Defendant's motion to dismiss (Docket Entry No. 26) should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the _26th_ day of January, 2011.

WILLIAM J. HAYNES, JR.
United States District Judge