UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| K & S ASSOCIATES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:09-1108 |
| | ) | JUDGE SHARP |
| AMERICAN ASSOCIATION OF | ) | |
| PHYSICISTS IN MEDICINE, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM**

Pending before the Court is the Motion for Summary Judgment filed by Defendant American Association of Physicists in Medicine ("AAPM") (Docket No. 102). That Motion has been fully briefed by the parties (Docket Nos. 103, 115 & 117) and, for the following reasons, will be denied.

**I. FACTUAL BACKGROUND**

AAPM is a non-profit association that, among other things, serves as an accrediting body for dosimetry calibration laboratories. When accredited, the laboratories are known as Accredited Dosimetry Calibration Laboratories or "ADCLs." Presently, there are three ADCLs accredited by AAPM: Plaintiff K & S Associates, Inc. ("K&S"); the University of Wisconsin ADCLs ("UW") and the M.D. Anderson Cancer Center ADCLS ("M.D. Anderson").

Unless there is a "triggering event" such as a change in ownership, each ADCL must apply for re-accreditation every four years. Applications are reviewed by AAPM's Calibration Laboratory Accreditation Committee ("CLA").

The CLA is composed of nine voting members (known as the CLA executive committee), drawn from the overall AAPM membership, plus a representative from each ADCLS. The executive

1

committee reviews ADCL's re-accreditation application, any on-site surveillance reports, responses to such reports, and the AAPM's rules for ADCL accreditation (known as the Criteria). Based upon its review, the executive committee votes on whether to recommend the lab for re-accreditation to AAPM's Board of Directors ("Board").

AAPM's Criteria includes a provision relating to conflicts of interest. Specifically, Section I.B.2 states:

> 2. Free of Conflict of Interest
>
> The applicant institution must be free of any conflict of interest with regard to its ownership and/or business and its responsibility to provide unbiased calibration results, technical advice, and assistance to the AAPM membership. The applicant must comply with the requirements of paragraphs 4.1.4 and 4.1.5 later in this document.
>
> The AAPM accreditation is a voluntary activity of the association conducted for the benefit of the AAPM membership and to promote the application of physics to biology under ARTICLE 3 of its Charter. Its primary objective is to establish and maintain the highest quality *secondary* standard dosimetry system in the US. It is not established for the benefit of commercial organizations engaged in the manufacture, marketing, distribution or sale of dosimetry instrumentation, since this would represent a conflict of interest under the ADCLS's role as a technical advisor and since there are other agencies, such as the National Voluntary Laboratory Accreditation Program (NVLAP) and the American Association for Laboratory Accreditation (A2LA), which currently provide accreditation programs to serve commercial interests.

(Docket No. 91-1 at 9, italic in original).

In 2008, K&S entered into a conditional agreement for the sale of its stock to Physikalisch-Technische Wekstaetten Dr. Pychlau GmbH ("PTW"), a manufacturer of dosimetry equipment based in Germany. In August 2008, Thomas Slowey, a principal of K&S, contacted Drs. Jan Seuntjens and Malcolm McEwen, then co-chairs of the CLA, to discuss the transaction prior to its official consummation. The purchase of K&S by PTW was consummated on January 16, 2009, retroactive

2

to January 1, 2009.

Standard Imaging, a dosimetry equipment manufacturer, submitted a letter to AAPM on February 9, 2009, protesting the ownership of an ADCL, K&S, by a dosimetry equipment manufacturer, PTW. A letter of protest followed from UW on February 13, 2009.

Members of the CLA-X held a conference call on February 20, 2009. Subsequently, Drs. Seuntjens and McEwen conducted a site visit at K&S, and ultimately recommended re-accreditation of K&S. AAPM also solicited a legal opinion from its attorney on the conflict of interest issue presented by PTW's ownership of K&S.

At AAPM's annual meeting on July 25, 2009, a "Conflict of Interest Roundtable" was held to discuss each labs' conflict of interest procedures and protocols. This discussion focused on the conflict of interest raised by the ownership of K&S by PTW.

Later that day, in a separate meeting, the executive committee voted 8-1 against re-accreditation of K&S. This decision was relayed to K&S via a July 27, 2009 letter that explained the decision was based upon the site visit report, K&S' responses to that report, and "the associated considerations related to Conflict of Interest as guided by the current AAPM Criteria." (Docket No. 88 ¶ 72).

K&S appealed the adverse decision to the Therapy Physics Committee ("TPC"), the parent committee of the CLA. On November 12, 2009, a TPC task group affirmed the decision of the executive committee against the re-accreditation of K&S.

This lawsuit followed in which K&S alleged that it was entitled to an injunction under the Clayton Act, 15 U.S.C. § 26, as a result of the alleged conspiracy in restraint of trade in violation of the Sherman Act, 15 U.S.C. § 1. K&S also sought and received a preliminary injunction

3

prohibiting AAPM from making a final decision on the accreditation of K&S. This injunction remains in effect by agreement of the parties.

The foregoing facts serve as the basis for AAPM's Motion for Summary Judgment and, not surprisingly, are undisputed since they are drawn almost entirely from K&S's Second Amended Complaint. However, K&S asserts that AAPM has "truncated" and "sanitized" the facts and, argues "the unvarnished truth . . . is that the membership of the CLA-X [executive committee] (consisting entirely of medical physicists completely unaccustomed to dealing with such matters) acceded to and agreed with the demands of the dominant 'alpha dog' University of Wisconsin ADCLS . . . which has 60% of the ADCLS calibration market and, to a lesser extent, the M.D. Anderson ADCLS." (Docket No. 115 at 2-3). K&S then spends nearly one-half of its 21 page response setting forth its "Expanded Statement of Relevant Facts."

K&S's presentation of facts in opposition to the Motion for Summary Judgment does not comply with this Court's Local Rule 56.01(c), which require that additional fact shall be submitted in a separate filing so that the adverse party has an opportunity to respond. However, because most of the additional facts are supported by citation to the record, and because AAPM does not object, the Court will consider the expanded version of the fact presented by K&S. Construed in its favor, those facts show the following:

After Mr. Slowey sought guidance from Drs. Seuntjens and McEwen about PTW's proposed acquisition of K&S, they approved K&S's Conflict of Interest Policies and Procedures in November 2008. Based upon approval of those Policies and Procedures, as well as all of the communications between Mr. Slowey and Drs. Seuntjens and McEwen, PTW and K&S went forward with the acquisition on January 16, 2009.

4

As noted, reaction from both UW and Standard Imaging was swift and, according to K & S, harsh.

Dr. Paul DeLuca, the Chairman of the Advisory Committee that oversaw the UW ADCL and "a powerful voice within the AAPM," called Dr. Seuntjens "out of the blue" on February 13, 2009, to express his concern about a manufacturer of an ionization chamber owning a calibration laboratory. This call was followed that same day by a letter Dr. DeLuca sent to Drs. Seuntjens and McEwen in which Dr. DeLuca "ominously warned" them that if the AAPM allowed the precedent of a dosimetry equipment manufacturer's ownership of an ADCLS, "the AAPM is opening itself to possible litigation from other equipment manufacturers to whom the conflict of interest is obvious." (Docket No. 115 at 6). Standard Imaging also sent a letter, allegedly "threatening Drs. Seuntjens and McEwen (and, by extension, the entire AAPM): 'Please be advised that Standard Imaging will take the actions deemed appropriate to prevent any manufacturer from operating an accredited dosimetry calibration laboratory in the U.S.'" (Id. at 5). The letters allegedly were a collaborative effort between UW and Standard Imaging with Dr. Thomas Mackie of UW e-mailing the Standard Imaging's Chief Regulatory Officer Ray Riddle that Riddle's letter was "good" and "this might work." (Id.).[1]

The letters had an immediate impact on Drs. Seuntjens and McEwen, as evidenced by the fact that they convened a telephone conference of the executive committee within a week of their receipt. Seven of the nine executive committee members participated in the teleconference and, while the majority believed that the K&S situation constituted a conflict of interest, the minutes of

---

[1] MD Anderson also entered the fray with emails to and from representatives of UW and Standard Imaging.

5

the meeting do not suggest the belief that the it was an unmanageable conflict of interest.

At least as of March 2009, Dr. Seuntjens was still of the view that K&S's "stringent" policies would successfully manage the conflict of interest issue, and this opinion remained after the site visit. Indeed after the site visit, both Drs. Seuntjens and McEwen concluded that K&S had satisfactorily dealt with the conflict of interest issue, with the final paragraph of their Report stating: "In summary, the site visit team recommends re-accreditation of K&S Associates under the new ownership of PTW and this final report will be presented to the [executive committee] for their review and vote." (Id. at 8). Although the site visit was conducted on April 21, 2009, the report is dated June 12, 2009.

On May 14, 2009, "the AAPM (specifically in the person of Angela Keyser, its Executive Director) retained the legal services of Mr. Bevan and his firm (Bevan, Mosca, Giuditta & Zarillo, P.C.)." (Id. at 7). Although the "the particulars remain unknown . . ., it is unmistakably clear that on or about June 10, 2009, Mr. Bevan rendered an opinion to the effect that the AAPM's Accreditation Criteria prohibited the ownership of an ADCLS by a manufacturer of dosimetry equipment." (Id.).

Following Mr. Bevan's opinion, Drs. Seuntjens and McEwen exchanged e-mails on June 10 and 11, 2009. In an e-mail in response to Dr. McEwen, Dr. Seuntjens wrote:

Hi Malcolm,

I feel the same as you.

On the one hand, we have never really applied the criteria to the letter. It has always been in a spirit of collaboration that we went through site visits. This time no different. I bet if we invited lawyers opinions on the criteria, multiple lab shutdowns would have occurred in the past. So what is different now? The loud voice of the Uwisc?

6

(Id. at 9).[2]

Throughout this period, K&S was left out of the loop. Consequently, it had no opportunity to respond to the conflict of interest issue and, based upon the site visit report, believed PTW's ownership was not an issue.

The first possible indication that there might be an issue concerning PTW's ownership came in the form of a July 7, 2009, email from Dr. Seuntjens in which he proposed to hold a "round table discussion" at the upcoming AAPM annual meeting with the lab directors. According to the email, "[t]he objective of this round table conference is to discuss the current handling of conflict of interest (COI) procedures in the AAPM CLA Criteria." (Id. at 10).

The round table discussion went forward as scheduled and included not only the three lab directors, but also Angela Keyser (AAPM's Executive Director), Mr. Gerald White (AAPM's Chairman of the Board and immediate past-President), and Dr. Steven Seltzer (then-current representative of the National Institute of Standards and Technology).

By most accounts, the round table discussion was an unpleasant event. Ms. Keyser who had attended numerous AAPM committee meetings recalled it as the "most heated" AAPM meeting she had ever attended, was "actually kind of surprised at how adamant" the entire group (save Slowey) was in voicing their opposition to PTW's ownership of K&S, and was "personally surprised" by the tone of the meeting. Mr. White thought that there was "bad karma" in the room and that there had been obvious collaboration between the two non-K&S lab directors in advance of the meeting. His contemporaneous notes reflected that there "[s]eems to be a bit of a relationship between

---

[2] In his deposition, Dr. McEwen testified that at some indeterminate point between his receipt of the Bevan opinion and the July 25, 2009, meeting of the CLA-X, he changed his mind about the K&S ownership issue and came to the view that PTW's ownership of the ADCLS was unacceptable under the AAPM's Accreditation Criteria.

7

University of Wisconsin and MD Anderson, definitely a GOB [good ole boy] feeling" as between Dr. Larry DeWerd of UW and Dr. Geoffrey Ibbott of MD Anderson, with Mr. Slowey of K&S the "odd man out." (Id. at 12).

The round table discussion foretold the outcome of the executive committee meeting that followed later the same day. As it pertains to K & S, the minutes reflect:

> 5. K&S. Underwent surveillance visit. Technically sound operation, no technical concerns. PTW acquisition in since January 16, 2009. Report by MMc [Dr. McEwen]. Motion to reaccredit put forward to vote. Discussion of motion. Issue: Criteria do not allow company ownership (AAPM Legal). Vote: 1 in favour, 8 opposed. Motion declined. Second motion: CLA Voting membership will investigate which modification of Criteria are necessary to enable manufacturer ownership. A follow-up discussion and vote will be held in a teleconference session, mid-to end September 2009.

(Id. at 13).[3]

K&S was informed of the decision by letter dated July 27, 2009. Shortly thereafter, K&S retained counsel whose efforts to discuss the matter with Mr. Bevan and the AAPM were rebuffed. Counsel was informed, however, that K&S could appeal the decision to AAPM's "Therapy Physics Committee."

Dr. Ellen Yorke, the chair of the Therapy Physics Committee and a medical physicist at the Memorial Sloan-Kettering Cancer Center in New York, put together a Task Group of three other medical physicists and herself. The Task Group conducted a telephonic meeting on November 12, 2009, which lasted slightly over an hour, but, in the end, unanimously affirmed the executive committee's decision.

## II. SUMMARY JUDGMENT STANDARDS

---

[3] Dr. McEwen was the sole vote in favor or re-accrediting K&S. Even though this was contrary to the view he held at that point, he felt an obligation to vote in favor of K&S's because he had authored the site visit report.

8

A party may obtain summary judgment if the evidence establishes there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County Sch. Sys., 205 F.3d 912, 914 (6th Cir. 2000). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in his or her favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).[4]

## III. APPLICATION OF LAW

So far as relevant, the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. Although it "literally prohibits every agreement 'in restraint of trade,'" Arizona v. Maricopa County Med. Soc'y, 457 U.S. 332, 342 (1982), that could not have been the drafter's intent, and so the Supreme Court "has long recognized that Congress intended to outlaw only unreasonable restraints." State Oil Co. v. Khan, 522 U.S. 3, 10 (1997).

In its Second Amended Complaint, K&S alleges that AAPM's conduct violates the Sherman Act under each of the three frameworks for analysis traditionally utilized in determining whether an action has an illegal anti-competitive effect. Specifically, K&S alleges AAPM's "concerted

---

[4] Although the foregoing is the general standard for considering summary judgment motions, the Court notes that, "[i]n this circuit, motions for summary judgment are disfavored in antitrust litigation," Smith v. Wholesale Co., Inc. v. R.J. Reynolds Tobacco Co., 477 F.3d 854, 861 (6th Cir. 2007), because of "the critical 'role that intent and motive have in antitrust claims[.]" Expert Masonry, Inc. v. Boone County, 440 F.3d 336, 341 (6th Cir. 2006).

9

refusal to deal constitutes a *per se* violation of Section 1 of the Sherman Act"; that, AAPM's conduct "constituted a violation of Section 1 of the Sherman Act under the so-called 'quick look' approach"; and, that, if "Defendant has articulated a pro-competitive justification for not re-accrediting K&S, Defendant has still violated Section 1 of the Sherman Act under a 'Rule of Reason' analysis." (Docket No. 81-1, Second Amended Complaint ¶¶ 92-94). Despite making these allegations, K&S, in response to the Motion for Summary Judgment, proffers no arguments which would support employing either a *per se* analysis or the "quick look" approach, and this Court's independent review suggests that those frameworks are inapplicable under the facts presented.

**A. *Per Se* and "Quick Look"**

*Per se* violations arise from "'[a]greements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.'" Found. for Interior Design Educ. Research v. Savannah Coll. of Arts & Design, 244 F.3d 521, 529 (6th Cir.2001) (quoting Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 5 (1958)). "Restraints that would fall under this category are illegal as a matter of law for reasons of efficiency; in essence, it is simply not worth the effort or resources of a Rule of Reason analysis when 'the Court [can] predict with confidence that the Rule of Reason will condemn [a restraint].'" Agnew v. NCAA, 683 F.3d 328, 336 (7th Cir. 2012) (quoting, Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 342 (1990)). "Examples of agreements that have been held unlawful pursuant to the *per se* rule include horizontal price fixing, output limitations, market allocation, and group boycotts." In re K-Dur Antitrust Litig., ___ F.3d ___, ___, 2012 WL 2877662 at *7 (3rd Cir. July 16, 2012) (collecting cases).

10

The "quick-look" analysis "is used where the *per se* framework is inappropriate, but where 'no elaborate industry analysis is required to demonstrate the anticompetitive character of . . . an agreement,' and proof of market power is not required." Agnew, 683 F.3d at 336 (citation omitted). "Put another way, the quick-look approach can be used when 'an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets,' . . . but there are nonetheless reasons to examine potential procompetitive justifications." Id. (internal citation omitted). Thus, "if an arrangement 'might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition,' then a 'quick look' form of analysis is inappropriate." Cal. *ex rel.* Harris v. Safeway, Inc., 651 F.3d 1118, 1134 (9th Cir. 2011) (quoting, Cal. Dental Ass'n v. F.T.C., 526 U.S. 756, 771 (1999)).

Accreditation is not "a 'practice [that] facially appears to be one that would always or almost always tend to restrict competition or decrease output.'" Id. (quoting, Broad Music, Inc. v. CBS, Inc., 441 U.S. 1, 19–20 (1979)). Quite the contrary, and as the Sixth Circuit held in applying a rule of reason analysis to an accreditation decision, "accreditation serves an important public purpose and can enhance competition." Interior Design, 244 F.3d at 530; see, Massachusetts Sch. of Law v. Am. Bar Assoc., 107 F.3d 1026, 1033 (3rd Cir. 1997) (rule of reason rather than *per se* approach was appropriate for discovery in law school's antitrust action against ABA relating to its accreditation standards). Accordingly, in the absence of any argument by K&S that shows it would be proper to utilize either the *per se* or "quick look" approach, and further because "[t]here is an automatic presumption in favor of the rule of reason standard," Care Heating & Cooling v. Amer. Std Inc., 427 F.3d 1008, 1012 (6th Cir. 2005), the Court addresses K&S's Sherman Act claim under

11

the rule of reason.

**B. "Rule of Reason"**

"The rule-of-reason test requires the court to analyze the actual effect on competition in a relevant market to determine whether the conduct unreasonably restrains trade." Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield, 552 F.3d 430, 436 (6th Cir. 2008). In utilizing the rule of reason test, a court is "to examine both the history of the restraint, and the restraint's effect on competition." Care Heating, 427 F.3d at 1012.

"To state a claim under the rule-of-reason test, a plaintiff must allege, inter alia, that the purportedly unlawful contract, combination, or conspiracy "produced adverse, anticompetitive effects within relevant product and geographic markets." Warrior Sports, Inc. v. NCAA, 623 F.3d 291, 286 (6th Cir. 2010). "'If the plaintiff meets this burden, the defendant must come forward with evidence of the restraint's procompetitive effects' to establish that the alleged conduct justifies the otherwise anticompetitive injuries." Nat'l Hockey League Players' Ass'n v. Plymouth Whalers, 325 F.3d 712, 718 (6th Cir. 2003) (citation omitted). "If the defendant is able to demonstrate procompetitive effects, the plaintiff then must show that any legitimate objectives can be achieved in a substantially less restrictive manner." Id.

As a preliminary matter, AAPM argues that its decision not to re-accredit K&S is "entitled to a level of deference." (Docket No. 103 at 16). What that level of deference should be, or why a level of deference mandates the entry of summary judgment, AAPM does not explain.

Marjorie Webster Jr. Coll., Inc. v. Middle States Ass'n of Colls and Secondary Schs., 432 F.2d 650 (D.C. Cir. 1970), upon which AAPM relies, held that "accreditation is an activity distinct from the sphere of commerce," a holding that "is questionable" in light of the Supreme Court's

12

decision in Goldfarb v. Va. State Bar, 421 U.S. 773 (1975), which held that there was no "antitrust exemption for the 'learned profession.'" Savannah College, 244 F.3d at 530; Jung v. Assoc. of Am. Med. Colls, 300 F. Supp.2d 119, 170 n.36 (D.D.C. 2004) (citation omitted) ("'Marjorie Webster is of questionable vitality after Goldfarb, to the extent that it draws a bright line between education and business, or accreditation policy and commerce'").[5] In any event, Marjorie Webster, was premised upon "the historic reluctance of Congress to exercise control in educational matters," and involved the refusal of a regional college accreditation association to accredit anything but not-for-profits schools. Even so, the court found that "the extent to which deference is due to the professional judgment of the association will vary both with the subject matter at issue and with the degree of harm resulting from the association's action." Marjorie Webster, 432 F.2d at 655.[6]

Here, K&S alleges significant harm, not only to itself, but also to the market as a whole. Whether it has sufficiently established any such harm is the subject of AAPM's final argument which the Court considers after AAPM's argument that K&S has failed to establish the relevant market or market power.

At the risk of dismissal, a Sherman Act plaintiff "bears the burden of defining 'the relevant

---

[5] Although it did not have to resolve the issue because it was not challenged on appeal, the Sixth Circuit in Savannah College stated "an accreditation decision may fall within the scope of commerce described in Goldfarb." Savanna College, 244 F.3d at 530. Given that language, and Savannah College's recognition that the Supreme Court in Goldfarb "read the scope of Section one of the Sherman Act very broadly," id., the Court rejects AAPM's request for dismissal based upon its argument that its accreditation decision did not affect trade or commerce. That AAPM's decision may have affected commerce is quite plausible in light of the underlying allegation that AAPM acted in concert with K&S's two sole competitors to eliminate it from the ADCL market and thereby create more business for the two survivors.

[6] AAPM also relies upon Savannah College, which afforded a level of deference to the accreditation decision of a non-profit organization that served as the only accrediting body for interior design education programs in the country. The Sixth Circuit did so, however, solely with respect to the organization's declaratory relief claim under Michigan law, not in regard to the college's counter-claim alleging a Sherman Act violation.

13

market within which the alleged anticompetitive effects . . . occur." Kentucky Speedway, LLC v. Nat'l Ass'n, 588 F.3d 908, 916 (6th Cir. 2009). "To determine this relevant market, 'no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that part of the trade or commerce, monopolization of which may be illegal.'" Id. (quoting, United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395 (1956)). "Reasonable interchangeability 'may be gauged by (1) the product uses, i.e., whether the substitute products or services can perform the same function, and/or (2) consumer response (cross-elasticity); that is, consumer sensitivity to price levels at which they elect substitutes for the defendant's product or service.'" Worldwide Basketball & Sport Tours, Inc. v. NCAA, 388 F.3d 955, 962 (6th Cir. 2004) (citation omitted).

When the facts are construed in K&S's favor, it has forwarded sufficient evidence to survive summary judgment on the issue of the relevant market and market power. Specifically, K&S defines a highly concentrated market of three dosimetry calibration laboratories accredited by the AAPM. These three laboratories compete against each other, and are the go-to source of dosimetry equipment calibration in a radiation therapy community that numbers approximately 2,500 medical facilities. AAPM's hold on the market is, in part, a result of federal regulations that require a "calibrated dosimetry system," a requirement that can be met by "using a system or source traceable to the National Institute of Standards and Technology (NIST) and published protocols accepted by nationally recognized bodies; or by a calibration laboratory accredited by the American Association of Physicists in Medicine (AAPM)." 10 C.F.R. § 35.630.

Even though NIST is listed as an alternative under the regulations, AAPM's Chairman

14

White conceded in his deposition that it was not feasible for NIST to do any significant volume of calibrations "for clinical users." (Docket No. 108-1, White Depo. at 44). Dr. Ibbott of MD Anderson was even more direct. He testified that the three accredited ADCLs laboratories do not compete with unaccredited calibration laboratories, that every major medical facility (which he numbered at roughly 2,500) requires ADCL calibrations of their radiation therapy equipment, that MD Anderson's ADCLs could not stay in business without AAPM accreditation, that the owners of radiation therapy equipment governed by the regulations have only three choices (UW, MD Anderson, or K&S), and that those owners, as a practical matter, cannot go to NIST because NIST would refuse their request for calibration and refer them back to AAPM. (Docket No. 105-3, Ibbott Depo. at 31, 35, 44-45 & 136-37).

The foregoing depiction of the concentrated market and AAPM's power in that market also has a bearing on AAPM's final argument, which is that "K&S cannot allege a harm protected under §1 of the Sherman Act[.]" (Docket No. 103 at 20).

"It is axiomatic that the antitrust laws were passed for 'the protection of competition, not competitors.'" Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 224 (1993) (citation omitted). As the Supreme Court has explained:

> [T]he purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself. It does so not out of solicitude for private concerns but out of concern for the public interest.

Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 459 (1993).

In its Second Amended Complaint, K&S claims that if it were to lose its accreditation, it would "go out of business." (Docket No. 88, Second Amended Complaint ¶ 88). However, K&S's

15

allegation of harm is not limited to the affect the re-accreditation decision will have on it, but rather to the market served by the AAPM accredited ADCLs, a market that would be serviced by two instead of three accredited ADCLs were K&S to lose its accreditation.

In response, AAPM notes that K&S fails to cite evidentiary support for this conclusion and argues that, even if the Court were to accept the presumption of market harm based upon a reduction of ADCLs from three to two, K&S cannot get around the "equally damning . . . fact that the evidence supports the opposite conclusion." AAPM then writes:

> First, both Christian Pychlau of PTW and K&S's Thomas Slowey testified that the two remaining ADCLs could handle the market. See Deposition of Christian Pychlau, D.E. 113-1 at 137-39, and see Deposition of Thomas W. Slowey, D.E. 114-1 at 194. Further, Mr. Slowey testified that there was no barrier to entry of one or more dosimetry labs seeking to become an ADCLS. Slowey Dep., D.E. 114-1 at 165-66. In fact, other labs have freely entered (K&S) or left (Sloan Kettering) the ADCLS market in the past. See id. at 198-99.

(Docket No. 117 at 5).

The cited deposition excerpts are hardly ringing endorsements for the propositions advanced by AAPM. While Dr. Pychlau testified that the remaining two AAPM accredited ADCLs' "business would increase because people have to go somewhere,"[7] he also testified in the cited pages that end users were going to be harmed if K&S lost its accreditation. For his part, Mr. Slowey's merely testified that it was "possible" the two remaining labs could pick up the slack were K&S to go out of business. As for barriers to entry, the cited testimony had to do with whether, in the absence of Mr. Slowey's non-compete, there would be a barrier to his "being involved in starting another lab or becoming a part of another lab," not specifically an AAPM accredited lab. As for labs "freely" entering and leaving the ADCLS market, Mr. Slowey simply stated in the cited pages that he had

---

[7] Given its market share, that "somewhere" was likely to be UW.

16

"no objection" when Sloan Kettering left the market.

Pychlau's and Slowey's testimony no more establishes the non-existence of a question of fact on the issue of whether K&S's lack of accreditation will affect competition, than K&S's conclusory assertion that a one-third reduction establishes the existence of such a question of fact. That said, a plaintiff is required to establish the anticompetitive effect within the relevant market. "This is usually shown through the use of expert testimony regarding the geographic market and a defendant's market power," Nilavar v. Mercy Health Sys.-Western Ohio, 244 Fed. Appx. 690, 695 (6th Cir. 2007), and the Court will consider such expert testimony at the bench trial in this case.[8]

## IV. CONCLUSION

On the basis of the foregoing, the Court will enter an Order denying AAPM's Motion for Summary Judgment.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE

---

[8] Apparently, both parties have economic experts lined up to testify on the issue of whether K&S's potential absence from the market will affect competition, as evidence by the fact that both have filed Motions in Limine to preclude those witnesses from testifying as to irrelevant matters and/or offering legal opinions. (Docket Nos. 119 & 123). The lack of citation to expert testimony in the summary judgment record appears to be the result of the approval of the parties' Joint Motion to Extend Deadlines (Docket Nos. 98 & 99), which extended the deadline for the disclosure of experts until after the Motion for Summary Judgment was filed.

17